1
2
3
4
5
6                         UNITED STATES DISTRICT COURT
7                             DISTRICT OF NEVADA
8                                    * * *
9    JOHN MICHAUD,                           Case No. 2:08-cv-01371-MMD-PAL
10                          Plaintiff,
                                                          ORDER
11        v.
                                             (Defs.' Motion to Extension – dkt. no. 61;
12   ROBERT BANNISTER, et al.,                   Defs.' Motion for Summary
                                                   Judgment – dkt. no. 69;
13                          Defendant.         Plf.'s Motion to Strike – dkt. no. 71)
14

15   **I.    SUMMARY**

16        Before the Court are Defendants Dr. Robert Bannister and Brian Williams' Motion

17   for Extension (dkt. no. 61) and Motion for Summary Judgment (dkt. no. 69), as well as

18   Plaintiff John Michaud's Motion to Strike (dkt. no. 71).  For the reasons set forth below,

19   Defendants' Motion for Summary Judgment is denied.  Defendants' Motion for Extension

20   is granted, and Michaud's Motion to strike is denied.

21   **II.   BACKGROUND**

22        The facts described below are based on the allegations set forth in Michaud's

23   Complaint as well as those testified to in Michaud's February 1, 2012, deposition.  (*See*

24   dkt. nos. 7 and 69-A.)  Michaud is an inmate in the custody of the Nevada Department of

25   Corrections ("NDOC") at the Southern Desert Correctional Center ("SDCC").  Michaud

26   has been in custody since 1992.

27        In 2003, while Michaud was in custody at Lovelock Correctional Center, a doctor

28   diagnosed him with a cataract in his right eye and recommended surgery to remove it.

After referral to the Utilization Review Panel ("URP"), Michaud's request for surgery was denied on the grounds that NDOC does not approve cosmetic surgery.[1]

In 2005, Michaud alleges that he again was diagnosed with a cataract in his right eye and that he was losing vision in that eye. Surgery was once more recommended by the presiding doctor, but the URP again denied Michaud's request on the grounds that surgery was not "life threatening" in light of his functioning left eye.

In May 2007, while at SDCC, Michaud's right eye was re-examined. His presiding infirmary physician, Dr. Leak, warned that due to the progression of the cataracts, Michaud could experience permanent blindness in his right eye. (Dkt. nos. 7 at 5 and 69-A at 17-18, 26.) Michaud also reported severe headaches at the time, and was warned that he could develop glaucoma. The URP denied surgery for the third time, and offered headache tablets and an eye patch as treatment. The eye patch was provided to him approximately three months after approval.

Michaud alleges that after filing a grievance to receive the corrective surgery he needed, he was provided a fourth recommendation for cataract surgery, but the URP again denied the request.

In addition to the in-house infirmary examinations of his eye, an outside physician from Nevada Eye and Ear clinic examined Michaud's cataract three times between 2007 and 2009. During that period, Michaud received a notice from Nevada Eye and Ear clinic in July 2008 recommending a follow-up exam for his right eye. The URP denied permission for the follow-up exam in July 2008.

Michaud brought this action against Warden Brian Williams and medical director Dr. Robert Bannister alleging violations of his Eighth Amendment rights arising out of

---

[1]The URP consists of the Medical Director, several other doctors, and the prisoner's treating physician. *Little v. D'Amico*, No. 3:04-cv-514, 2007 WL 295365, at *2 (D. Nev. Jan. 25, 2007). The URP decides whether cosmetic or elective off-site medical services — in this case, cataract removal surgery — is medically necessary. *Id.*; *Dixon v. Bannister*, 845 F. Supp. 2d 1136, 1140 (D. Nev. 2012); *see also* NDOC Administrative Regulation 618, *available at* http://www.doc.nv.gov/sites/doc/files/pdf/AR618.pdf. The Medical Director has the final authority to decide whether surgery is medically necessary.

1   deliberate indifference to his need for cataract removal surgery. On September 18,
2   2009, the Court granted Defendants' Motion to Dismiss on statute of limitations grounds.
3   (Dkt. no. 16.) On appeal, the Ninth Circuit affirmed in part and reversed in part, holding
4   that while the 2003 and 2005 requests for surgery were time barred, Michaud's claims
5   relating to his 2007 and 2008 surgery denials could proceed. (Dkt. no. 22.)

6           After this Complaint was filed, Michaud received his requested cataract surgery in
7   February 2009. As a result, he concedes that his original request for injunctive relief is
8   moot. (*See* dkt. no. 69-A at 12.) Michaud only seeks damages for injuries resulting from
9   Defendants' delays in approving his surgery. Defendants subsequently brought this
10  Motion for Summary Judgment on March 30, 2012. (Dkt. no. 69.)

11  **III.    LEGAL STANDARD**

12          The purpose of summary judgment is to avoid unnecessary trials when there is no
13  dispute as to the facts before the court. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18
14  F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is appropriate when the pleadings,
15  the discovery and disclosure materials on file, and any affidavits "show there is no
16  genuine issue as to any material fact and that the movant is entitled to judgment as a
17  matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). An issue is "genuine"
18  if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for
19  the nonmoving party and a dispute is "material" if it could affect the outcome of the suit
20  under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).
21  Where reasonable minds could differ on the material facts at issue, however, summary
22  judgment is not appropriate. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir.
23  1995). "The amount of evidence necessary to raise a genuine issue of material fact is
24  enough 'to require a jury or judge to resolve the parties' differing versions of the truth at
25  trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l
26  Bank v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)). In evaluating a summary
27  judgment motion, a court views all facts and draws all inferences in the light most
28  ///

3

1  favorable to the nonmoving party. *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793
2  F.2d 1100, 1103 (9th Cir. 1986).

3      The moving party bears the burden of showing that there are no genuine issues
4  of material fact. *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). "In
5  order to carry its burden of production, the moving party must either produce evidence
6  negating an essential element of the nonmoving party's claim or defense or show that
7  the nonmoving party does not have enough evidence of an essential element to carry its
8  ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210
9  F.3d 1099, 1102 (9th Cir. 2000).   Once the moving party satisfies Rule 56's
10 requirements, the burden shifts to the party resisting the motion to "set forth specific
11 facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.  The
12 nonmoving party "may not rely on denials in the pleadings but must produce specific
13 evidence, through affidavits or admissible discovery material, to show that the dispute
14 exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do
15 more than simply show that there is some metaphysical doubt as to the material facts."
16 *Orr v. Bank of Am.*, 285 F.3d 764, 783 (9th Cir. 2002) (internal citations omitted).  "The
17 mere existence of a scintilla of evidence in support of the plaintiff's position will be
18 insufficient." *Anderson*, 477 U.S. at 252.

19 **IV.   DISCUSSION**

20     Defendants filed their Motion for Summary Judgment on March 30, 2012, after the
21 deadline for filing dispositive motions.  Defendants earlier filed a Motion for Extension of
22 the Dispositive Motion Deadline to allow for additional time to take Michaud's deposition,
23 have it transcribed, and review it for use in their dispositive motions.  (*See* dkt. no. 61.)
24 Good cause appearing, the Court grants Defendants' Motion for Extension, and reviews
25 the Motion for Summary Judgment accordingly.  Because Michaud's Motion to Strike
26 requests striking the summary judgment motion, Michaud's Motion is denied.  (Dkt. no.
27 71.)
28 ///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

A.      Eight Amendment claim

     1.      Eighth Amendment standard

Although prisoners may be deprived of some of their rights fundamental to liberty, they "retain the essence of human dignity inherent in all persons." *Brown v. Plata*, 131 S. Ct. 1910, 1928 (2011).  The Eighth Amendment protects this dignity in its prohibition against cruel and unusual punishment.  Because society takes from prisoners their liberty to provide for themselves, they become dependent on the state for shelter, food, clothing, and medical care.  "A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society." *Id.*

"[T]he government has an obligation to provide medical care for those whom it punishes by incarceration," *Hutchinson v. United States*, 838 F.2d 390, 392 (9th Cir. 1988), and cannot be deliberately indifferent to the medical needs of its prisoners. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  "[T]he appropriate inquiry when an inmate alleges that prison officials failed to attend to serious medical needs is whether the officials exhibited deliberate indifference." *Hudson v. McMillian*, 503 U.S. 1, 5 (1992).

Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment.  *Estelle*, 429 U.S. at 104.  Prison doctors, medical staff, or prison guards can all be liable for Eighth Amendment violations.  *Id.*  The Supreme Court has identified two forms of deliberate indifference: when prison officials deny, delay or intentionally interfere with medical treatment, or by the way in which prison physicians provide medical care. *See Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988) (citing *Estelle*, 429 U.S. at 104-05).

In the Ninth Circuit, the test for deliberate indifference consists of two parts. *McGuckin v. Smith*, 974 F.2d 1050 (9th Cir. 1991), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc).  First, the plaintiff must show a "serious medical need" by demonstrating that failure to treat her or his condition could result in further significant injury or the unnecessary and wanton infliction of pain.

*Id.* A serious injury is not the type of "routine discomfort [that] is 'part of the penalty that criminal offenders pay for their offenses against society.'" *Hudson*, 503 U.S. at 9 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). "The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a 'serious' need for medical treatment." *McGuckin*, 974 F.2d at 1059-60 (citations omitted).

Second, the plaintiff must demonstrate that the defendant's response to the need was deliberately indifferent by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal quotations and citations omitted). The requirement of a purposeful act/failure to respond is intended to preclude a finding of deliberate indifference for accidents or inadvertent failures to provide adequate medical care. *Estelle*, 429 U.S. at 105.   Mere negligence does not rise to an Eighth Amendment violation. *Hutchinson*, 838 F.2d at 394.   In order to demonstrate harm caused by the indifference, a prisoner need not show that the harm was substantial, but such a showing would provide additional support for the inmate's claim of deliberate indifference. *McGuckin*, 974 F.2d at 1060.

Once these requirements are met, the factfinder must determine whether the defendant was deliberately indifferent to the prisoner's medical needs. *McGuckin*, 974 F.2d at 1060.  "[T]he more serious the medical needs of the prisoner, . . . the more likely it is that a plaintiff has established 'deliberate indifference' on the part of the defendant." *Id.* at 1061.  A finding that the defendant's neglect was isolated weighs against a finding of deliberate indifference, while a repeated failure to treat an inmate or a single egregious failure supports such a finding. *Id.* at 1060-61.

///

///

### 2.   Serious medical need

Defendants argue that Michaud fails to demonstrate that cataract surgery is a serious medical need the denial of which can sustain an Eighth Amendment violation. Defendants point to dicta in *Hurt v. Mahon*, 2009 WL 2877001, at *2 (E.D. Va. 2009) that doubts whether a cataract is a significant medical necessity for an inmate.  Defendants also note that Michaud's cataract was regularly monitored, and that Michaud admitted that the cataract did not interfere with his daily activities.

In his deposition testimony, Michaud testified that in the period between 2003 and 2009, the cataracts in his right eye made his vision appear as if Vaseline was coated over his eye to obfuscate his vision.  (*See* dkt. no. 69-A at 11.)  During this period, Michaud had essentially zero functional vision out of his right eye.  (*Id.*)  He further testified that without his eye patch, he experienced watery eyes and severe headaches. (*Id.* at 19.)  After prison staff provided Michaud with an eye patch between 2007 and 2009, he stopped seeking treatment for headaches.  (*Id.* at 31.)  However, Michaud testified that physical altercations resulted after he began using the eye patch, as the use of only his left eye made him vulnerable to inadvertent contact with other inmates and increased the chances of being involved in a fight.  (*Id.* at 28-29.)  From these physical altercations, Michaud suffered an estimated six to eight black eyes and many missing teeth. (*Id.* at 29-31.)  Michaud further testified that in 2008 an officer ran him over in a cart, although Michaud did not sustain injury because of this incident.  (*Id.*)

Viewing this evidence in the light most favorable to Michaud, a genuine issue of material fact exists as to whether Michaud's cataract constituted a serious medical need. Michaud testified that infirmary physician Dr. Leak informed Michaud that blindness and irreparable injury could result from his untreated cataract.  Michaud further testified that he had lost almost all of his ability to see in his right eye, and was able to appreciate only the existence of light.  Based on this uncontested evidence, it is clear that this is not a situation of a minor cataract with little impact on an inmate's vision.  *See Espinosa v. Saladin*, No. 1:08-CV-736, 2009 WL 3102483, at *3 (W.D. Mich. Sep. 23, 2009) (holding

1   that no Eighth Amendment violation exists in part because inmate "maintained
2   acceptable L eye vision" in the face of a cataract); *Stevenson v. Pramstaller*,
3   No. 07-cv-14040, 2009 WL 804748, at *5 (E.D. Mich. March 24, 2009) (holding that
4   inmate failed to demonstrate a serious medical need from denial of cataract surgery
5   where defendants' decision "was motivated by a medical finding that [plaintiff's] eye
6   condition was stable for almost a year").  Rather, Michaud's cataract was serious enough
7   not only to functionally eviscerate his ability to see out of his right eye, but to place him at
8   serious risk of developing glaucoma and permanent blindness in that eye.  As a result,
9   Michaud has provided enough evidence to raise a genuine issue as to whether he was
10  faced with a serious medical condition.  Of course, this ruling does not necessarily
11  suggest that the constitution compels immediate treatment for *all* inmate disabilities; but
12  those that carry significant risks of permanent injury, like Michaud's advanced cataract,
13  fall squarely within the ambit of "serious medical needs" that raise constitutional scrutiny.

14       In an analogous persuasive case, the Sixth Circuit recently held that delays
15  resulting from failure to provide swift cataract removal surgery constituted a serious
16  medical need due to the incidental harms attendant to postponing the surgery.  *See*
17  *Cobbs v. Pramstaller*, 475 Fed. App'x. 575, 580 (6th Cir. 2012) (unpublished).[2]  In
18  *Cobbs*, the plaintiff waited four years for cataract-removal surgery, and ultimately fully
19  recovered his eyesight after receiving the operation.  *Id.*  Nevertheless, the Sixth Circuit
20  held that a serious medical need existed because the delay cause a more complicated
21  and risky procedure.  *Id.*  Although plaintiff's condition was regularly monitored, a serious
22  medical need existed for a speedy surgery due to the incidental harm that would result
23  from a delay.  *Id.*

24

25       ───────────────

26       [2]As with the unpublished decisions of other Circuits, the Court may cite
    unpublished Sixth Circuit opinions for their persuasive value.  *See* 6th Cir. Rule 32.1;
    *Crump v. Lafler*, 657 F.3d 393, 405 (6th Cir. 2011) ("Unpublished decisions in the Sixth
27  Circuit are, of course, not binding precedent on subsequent panels, but their reasoning
    may be instructive or helpful."); *accord* 9th Cir. Rule 36-3(b) (following Fed. R. App. P.
28  32.1(a) by allowing citation of unpublished decisions issued on or after January 1, 2007).

This Court previously held that an inmate demonstrated a serious medical need when doctors recommended removal of a cataract, and where the condition led to headaches, inability to see in the prison yard, and ultimately to blindness in the affected eye. *See White v. Snider*, No. 3:08-cv-252, 2010 WL 331742, at *5 (D. Nev. Jan. 26, 2010). Notwithstanding the *Hurt* court's declaration, without explanation, that "it is doubtful that a cataract is a sufficiently serious medical need," *Hurt*, 2009 WL 2877001, at *2, other courts have joined with the Sixth Circuit and this District in holding that a cataract may provide a basis for an Eighth Amendment violation. *See, e.g.*, *Hunt v. Mohr*, No. 2:11-cv-653, 2012 WL 1537294, at *4-5 (S.D. Ohio May 1, 2012) (Deavers, J., magistrate judge) (holding that inmate's pleading stated Eighth Amendment cause of action for alleged failure to provide cataract removal) *adopted by* 2012 WL 2196087 (S.D. Ohio June 15, 2012); *Morris v. Corr. Med. Servs., Inc.*, No. 2:07-cv-10578, 2012 WL 5874477, at *2-3 (E.D. Mich. Nov. 20, 2012) (adopting magistrate judge's recommendation that genuine issue of material existed as to whether failure to remove cataract was a serious medical need).

Defendants append to their summary judgment motion a declaration from Dr. Bannister providing what is essentially an expert opinion as to whether a cataract is a serious medical condition. (Dkt. no. 69-B.) In the affidavit, Dr. Bannister opines that a cataract does no damage to an infected eye, no harm results from delays in removing a cataract, and that a cataract does not lead to permanent vision loss. (*Id.* at ¶¶ 9-11.) This testimony contradicts both Michaud's testimony regarding Dr. Leak's diagnosis as well as the case law cited above containing various rulings related to the potential seriousness of cataracts. *See White*, 2010 WL 331742, at *2 (inmate suffered blindness in his eye as a result of a failure to remove a cataract). Even if Dr. Bannister's medical training covers the field of optometry or ophthalmology (which it does not), this conflict in

///

///

///

1   opinion creates a genuine issue of fact for the jury to decide.[3]  Indeed, NDOC medical

2   directive 106.01 provides that inmates will be considered for removal of a cataract if their

3   vision renders them unable to perform the required tasks of daily living.  (Dkt. no. 69-C.)

4   Indeed, one could read this directive to contradict Dr. Bannister's affidavit: if cataracts

5   are not serious, cannot result in blindness, and no harm results from delays in their

6   removal, no such medical directive would be required.  NDOC policy by its own language

7   concedes that cataracts may interfere with daily life, lending further support to Michaud's

8   argument that his vision deficiencies were a serious medical need.  Defendants have

9   thus failed to demonstrate as a matter of law that the existence of cataracts cannot be a

10  serious medical condition.

11              **3.      Purposeful act or failure to respond**

12          In addition, Michaud meets his burden to establish a genuine issue of material

13  fact as to whether Defendants were deliberately indifferent to his medical needs.  This

14  factor considers whether Defendants' provision of an eye patch notwithstanding

15  repeated recommendations for surgery constituted enough medical care to satisfy the

16  Eighth Amendment.  If not, then Michaud's deposition testimony could create a genuine

17  issue of material fact on this point.  Mindful of this fundamental dispute between the

18  parties, the Court must resolve the issue from a sparse evidentiary record that consists

19  only of Dr. Bannister's declaration and Michaud's deposition testimony.  Although a

20  moving party may simply demonstrate that its opponent lacks evidence to meet its

21  burden of persuasion on an essential element, *see Nissan Fire & Marine Ins. Co.*, 210

22  F.3d at 1102, Michaud's testimony supports a *prima facie* determination of deliberate

23  indifference.

24          Defendants argue that they cannot be held accountable for a purposeful act or a

25  failure to respond because they were not put on notice that Michaud's medical

26  _____

27          [3]To the extent that Defendants include Dr. Bannister's affidavit as an expert
    opinion, the Court does not consider it as such as Defendants have failed to conform to
28  the dictates of Fed. R. Civ. P. 26(a)(2).

1   conditions led to physical altercations and headaches.  Defendants further argue that
2   Michaud failed to demonstrate a sufficient level of culpability beyond mere negligence.
3   Michaud testified that he did not seek treatment for any of his injuries, and did not report
4   any of the assaults or inform any staff about them.  (Dkt. no. 69-A at 31.)

5        Michaud's May 2007 doctor visit on its own created a duty on the part of
6   Defendants to approve his eye treatment.  As Michaud testified, it was at this visit where
7   he was informed by the Dr. Leak that he faced permanent blindness if the cataract
8   removal surgery was not performed.  (Dkt. nos. 7 at 5 and 69-A at 18, 26.)  Defendants
9   do not contest the truth of this evaluation.  Consequently, the URP's denial of Michaud's
10  surgery request raises a genuine issue of material fact as to whether Defendants failed
11  to act appropriately by rejecting the doctor's recommendation.  The URP knew about the
12  recommendation, denied it, and offered only headache pills and an eye patch to treat the
13  condition three months later.  These were not accidental or inadvertent failures, *see*
14  *Estelle*, 429 U.S. at 105, but rather considered decisions in response to Michaud's
15  medical concerns.  *See Clem v. Lomeli*, 566 F.3d 1177, 1181 (9th Cir. 2009) (defendants
16  must know of a substantial risk of serious harm in order to have been deliberately
17  indifferent).

18       In addition to the URP's 2007 denial of surgery, the URP also denied Michaud
19  permission to have a follow-up exam in contravention of a July 2008 doctor's
20  recommendation.  In total, Michaud testified that he received as many as five evaluations
21  between 2007 and 2009.  (Dkt. no. 69-A at 26-27.)  Defendants were at best negligent
22  when providing Michaud with an eye patch as a form of treatment for cataracts that an
23  infirmary physician stated could result in blindness, and at worst were deliberately
24  indifferent to Michaud's Eighth Amendment rights.  The facts before the Court could
25  sustain a finding of negligence, gross negligence, recklessness, deliberate indifference,
26  or even intentional misconduct.  While negligence and gross negligence cannot be the
27  basis for judgment in Michaud's favor, deliberate indifference or intentional misconduct
28  ///

1    can.  Because there is a genuine issue of material fact as to Defendants' culpability, the

2    summary judgment motion must be denied as to this requirement.

3           Defendants argue that since Michaud refused to inform prison staff of his injuries

4    in the period between 2007 and 2009, Defendants did not know about Michaud's

5    medical needs and could not be held constitutionally liable.  Consequently, they argue,

6    Michaud cannot demonstrate a sufficient level of culpability to sustain a judgment in his

7    favor.  But Defendants' argument conflates the serious medical need (cataracts) with the

8    physical harm sustained by Michaud as a result of their lack of action (black eyes and

9    missing teeth).  Even if Defendants knew of Michaud's injuries from the altercations, and

10   even if they treated these injuries with haste and utmost care, Michaud's constitutional

11   claim survives.  Defendants' representation to the Court that they would have provided

12   some treatment for Michaud's injuries is of little consequence, since promising to patch

13   up harm from an unjustified denial of medical care does not cure an Eighth Amendment

14   violation.   At least some irreparable injury occurred from Defendants' deliberate

15   indifference to treat Michaud's condition that could not be patched over with later

16   treatment — for example, losing teeth from fights.  (*See* dkt. no. 69-A at 29-30.)

17          Defendants further argue that Michaud *might* have been re-evaluated had they

18   known that his poor vision caused problems with other inmates.  But Defendants should

19   not have needed further evidence of serious medical harm than that which was already

20   presented to them, namely that Michaud risked permanent blindness without surgery.

21   Aware of this risk, and aware of their own medical staff's recommendations, Defendants

22   cannot argue that they required *even more* evidence that their surgery denials

23   endangered Michaud.   Although Defendants claim that the evidence demonstrates

24   Michaud's daily activities were not impaired by his cataract, and thus did not implicate

25   NDOC's medical directive concerning cataract removal, Michaud was not required to go

26   permanently blind before requesting prophylactic care.  *See McGuckin*, 974 F.2d at 1059

27   ("A serious medical need exists if the failure to treat a prisoner's condition *could* result in

28   further significant injury . . . .") (emphasis added).

1       Lastly, Defendants' failure to provide Michaud with surgery to correct his vision
2   did not result from merely a difference of medical opinion between physicians and a
3   prisoner-patient.  *See Franklin v. State of Or., State Welfare Div.*, 662 F.2d 1337, 1344
4   (9th Cir. 1981); *Thomas v. Stephens*, No. 7:10-cv-90, 2011 WL 1532150, at *4 (W.D. Va.
5   April 4, 2011) *adopted by* 2011 WL 1540282 (recommending that cataract not be held to
6   constitute serious medical need in part based on conflicting physician evaluation that
7   cataract was unlikely to lead to future medical harm).   The facts as testified to by
8   Michaud suggest that each physician who individually reviewed Michaud's vision
9   concluded that surgery was necessary, and that the only difference of opinion existed
10  between these physicians and the URP.   This is not a situation where the
11  prisoner-patient disagrees with his physician.  Michaud raises a genuine issue of fact as
12  to whether the URP's treatment plan consisting of medication and an eye patch was
13  medically unacceptable and chosen in "conscious disregard of an excessive risk to [his]
14  health."   *See Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996).    Although
15  Defendants contest in their Reply the legitimacy of the medical evaluations made by the
16  doctors who reviewed Michaud, the Court declines to disregard these medical opinions.
17  Whether Defendants' treatment plan was adequate or whether it was medically
18  unacceptable is a determination a jury ought to make.  *See White*, 2010 WL 331742, at
19  *5 (recommending denial of summary judgment because prisoner can establish
20  deliberate indifference where physician chose medically unacceptable treatment to
21  remedy cataracts).

22              **4.    Harm caused by the indifference**

23      Michaud also satisfies his burden of demonstrating a harm caused by Defendants'
24  deliberate indifference.  Michaud testified that because he could not see out of his right
25  eye, he suffered harm from the delay in removal of his cataract from fights with other
26  inmates which resulted in missing teeth and black eyes.   (Dkt. no. 69-A at 33-35.)
27  Michaud does not allege any other physical harm from the delay in provision of his
28  requested medical care, but does suggest in his Response that he was emotionally

1   agitated by being placed in the yard of a prison deemed in 2009 to be the most violent in

2   the NDOC  (*Id.* at 15-16.)

3       Defendants erroneously argue that the lack of long-term harm caused by their

4   conduct defeats Michaud's ability to demonstrate a serious risk to his future health.

5   Although the situations in *Cobbs* or *White* involved more serious injuries from three

6   minor altercations, *see* 475 Fed. App'x. at 850; 2010 WL 331742, at *2, Michaud need

7   not show that his harm was substantial in order to recover.  *McGuckin*, 974 F.2d at 1060

8   (noting that a delay in surgery violates the Eighth Amendment if the denial was harmful,

9   regardless of whether the injury was significant or not); *see also Hudson v. McMillian*,

10  503 U.S. 1, 9 (1992) (rejecting "significant injury" requirement for Eighth Amendment

11  excessive force claim and noting that the Constitution is violated "whether or not

12  significant injury is evident"); *Felix v. McCarthy*, 939 F.2d 699, 701 (9th Cir. 1991) ("[I]t is

13  not the degree of injury which makes out a violation of the Eighth Amendment. Rather, it

14  is the use of official force or authority that is 'intentional, unjustified, brutal and offensive

15  to human dignity.'").  Providing evidence in the form of his deposition testimony —

16  evidence that Defendants do not refute — that other inmates injured Michaud during

17  these fights satisfies his burden of persuasion on the essential element of harm.  This is

18  particularly true where Michaud alleges the loss of permanent teeth, an irreparable

19  physical injury.   In addition, Michaud raises the possibility that his physical injuries

20  coincided with emotional injury suffered when he wore his patch while in the prison yard.

21  Thus, so long as a serious medical need existed, and Defendants acted with the

22  required indifference, non-substantial physical and emotional injury suffices to make a

23  *prima facie* showing of Defendants' liability under the Eighth Amendment.

24       **B.    Supervisory Liability**

25       Michaud sued Dr. Bannister and Warden Williams, the latter under both a theory

26  of personal and supervisory liability.  (*See* dkt. no. 72 at 12; 69-A at 38-39.)  Defendants

27  argue that Williams cannot be held liable for an Eighth Amendment violation because, as

28  ///

14

1  a supervisor, he was not personally liable for any violation of Michaud's conduct,
2  notwithstanding the fact that he responded negatively to Michaud's prison grievance.

3  "A defendant may be held liable as a supervisor under § 1983 if there exists either
4  (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient
5  causal connection between the supervisor's wrongful conduct and the constitutional
6  violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011). "A plaintiff must show the
7  supervisor breached a duty to plaintiff which was the proximate cause of the injury. The
8  law clearly allows actions against supervisors under section 1983 as long as a sufficient
9  causal connection is present and the plaintiff was deprived under color of law of a
10  federally secured right." *Id.* (quoting *Redman v. Cnty. Of San Diego*, 942 F.2d 1435,
11  1447 (9th Cir. 1991) (en banc)). "A supervisor can be liable in his individual capacity for
12  his own culpable action or inaction in the training, supervision, or control of his
13  subordinates; for his acquiescence in the constitutional deprivation; or for conduct that
14  showed a reckless or callous indifference to the rights of others." *Starr*, 652 F.3d at
15  1208 (quoting *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir.1998)).

16  Michaud alleges, and Defendants concede, that Williams responded to Michaud's
17  internal prison grievance arising out of Michaud's medical care claims.  This suffices to
18  demonstrate personal involvement in the underlying violations.  Defendants argue that
19  Williams was not responsible for or personally involved in providing Michaud medical
20  care.  While this may be true, Williams was personally responsible for overseeing the
21  prison grievance system, and for rectifying any violative medical conditions in the prison.
22  Although constitutional claims cannot attach on a *respondeat superior* theory of liability,
23  *see Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002), Williams personally denied
24  Michaud's grievance.  That is enough to hold Williams liable, for it was both the URP that
25  denied Michaud's care as well as Williams who refused to review and correct that denial.
26  Defendants cannot shield Williams from liability while simultaneously acknowledging his
27  response to the grievance.  As an Eighth Amendment violation can attach to *any* official
28  who denies an inmate constitutionally adequate medical care, a supervisor who denies

1    medical care via a grievance is equally liable as a physicians' panel determining the

2    medical necessity of a particular treatment.  *See Hutchinson*, 838 F.2d at 394 (noting

3    that prison officials who "deny, delay or intentionally interfere with medical treatment"

4    may be liable for an Eighth Amendment violation).  Accordingly, both Defendants may be

5    found personally liable in this action.[4]

6        ## C.    Qualified Immunity

7        Defendants argue that qualified immunity protects them from any determination

8    that they violated Michaud's Eighth Amendment rights.  Their argument is unavailing for

9    the reasons set forth below.

10       Where a plaintiff has stated a valid cause of action under § 1983, government

11   officials sued in their individual capacities may raise the affirmative defense of qualified

12   or absolute immunity.  *See Spoklie v. Montana*, 411 F.3d 1051, 1060 (9th Cir. 2005).

13   "Qualified immunity balances two important interests — the need to hold public officials

14   accountable when they exercise power irresponsibly and the need to shield officials from

15   harassment, distraction, and liability when they perform their duties reasonably."

16   *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  "[Q]ualified immunity applies regardless

17   of whether the government official's error is a mistake of law, a mistake of fact, or a

18   mistake based on mixed questions of law and fact."  *Id.* (citations omitted).  The doctrine

19   of qualified immunity protects government officials "from liability for civil damages insofar

20   as their conduct does not violate clearly established statutory or constitutional rights of

21   which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818

22   (1982).  This immunity is granted broadly and "provides ample protection to all but the

23   _____

24       [4]Although Michaud's Response is unclear as to this point, he also appears to hold
     Williams liable as a supervisor even in the absence of personal involvement.  (Dkt. no.
25   69-A at 38-39.)  There are no facts or allegations in the record to justify supervisory
     liability, whether, for example, a failure to train, failure to supervise, or acquiescence in
26   constitutional deprivations of subordinates.  *See Starr*, 652 F.3d at 1207-08; *Redman*,
     942 F.2d at 1446 ("Supervisory liability exists even without overt personal participation in
27   the offensive act if supervisory officials implement a policy so deficient that the policy
     itself is a repudiation of constitutional rights and is the moving force of a constitutional
28   violation.").

1    plainly incompetent or those who knowingly violate the law." *Moran v. Washington*, 147

2    F.3d 839, 844 (9th Cir. 1998) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

3          "A [g]overnment official's conduct violates clearly established law when, at the

4    time of the challenged conduct, [t]he contours of [a] right [are] sufficiently clear that every

5    'reasonable official would have understood that what he is doing violates that right.'"

6    *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (quotation marks and citation omitted).

7    "[T]he right allegedly violated must be defined at the appropriate level of specificity

8    before a court can determine if it was clearly established." *Dunn v. Castro*, 621 F.3d

9    1196, 1201 (9th Cir. 2010).  However, courts "do not require a case directly on point, but

10   existing precedent must have placed the statutory or constitutional question beyond

11   debate." *al-Kidd*, 131 S. Ct. at 2083.

12         In *Saucier v. Katz*, 533 U.S. 194, 201 (2001), the Supreme Court mandated a

13   two-step sequence for resolving qualified immunity claims: first, determine whether the

14   defendant violated the plaintiff's constitutional right, and second, determine whether that

15   right was "clearly established" at the time of defendant's alleged misconduct.  However,

16   the Supreme Court since held that the *Saucier* protocol is no longer mandatory.

17   *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  The Supreme Court left the order of

18   decision to the "sound discretion" of district court judges.  *Id.*  The Court chooses to

19   follow the *Saucier* protocol in this case.

20         Because the Court has determined that triable issues of material fact exist as to

21   whether Defendants violated Michaud's Eighth Amendment rights, the question remains

22   whether qualified immunity protects Defendants regardless of this factual dispute.  "[A]

23   district court should decide the issue of qualified immunity as a matter of law when 'the

24   material, historical facts are not in dispute, and the only disputes involve what inferences

25   properly may be drawn from those historical facts.'" *Conner v. Heiman*, 672 F.3d 1126,

26   1131 (9th Cir. 2012) (quoting *Peng v. Mei Chin Penghu*, 335 F.3d 970, 979-80 (9th Cir.

27   2003)).  "Only where 'historical facts material to the qualified immunity determination are

28   ///

1   in dispute' should the district court submit the issue to a jury." *Conner*, 672 F.3d at 1131

2   (quoting *Torres v. City of Los Angeles*, 548 F.3d 1197, 1211 (9th Cir. 2008)).

3          There can be no doubt that Michaud possesses an Eighth Amendment right to

4   adequate medical care while incarcerated.   In determining the existence of qualified

5   immunity, the Court must assess whether the violation was clearly established "in light of

6   the specific context of the case, not as a broad general proposition." *Sims v. Stanton*, __

7   F.3d __, 2012 WL 5995447, at *6 (9th Cir. 2012) (quoting *Saucier*, 533 U.S. at 201).  As

8   with other areas of laws, no singular rule on how prison officials must deal with cataracts

9   can be divined from the case law; all require context-specific inquiries into the

10  circumstances of a particular prisoner-patient's case.   While evidence in some cases

11  might demonstrate that a particular inmate's vision deficiencies are serious medical

12  conditions that require surgery, other cases might involve relatively benign cataracts that

13  will not result in any serious harm.  For this reason, both parties to this litigation can find

14  support in the case law.  Each case is unique, and each constitutional calculus is slightly

15  different.

16         Here, Defendants challenge Michaud's contention that their treatment plan was

17  medically unacceptable.  Michaud is entitled to argue before a factfinder whether the

18  URP's course of treatment was medically unacceptable and chosen in "conscious

19  disregard of an excessive risk" to Michaud's health.  *See Jackson*, 90 F.3d at 332.   In

20  *Jackson*, the Ninth Circuit afforded the plaintiff the opportunity to argue at trial that denial

21  of a kidney transplant occurred on account of personal animosity rather than honest

22  medical judgment.  *Id.*  Similarly, the question of the medical propriety of Defendants'

23  response to Michaud's medical needs is a disputed question of fact requiring analysis of

24  Michaud's medical records, determination of the available remedies, and potential

25  canvassing of expert opinions.  Consequently, this is a case where those "historical facts

26  material to the qualified immunity determination are in dispute." *See Torres*, 548 F.3d at

27  1211.  If Michaud succeeds at trial in demonstrating that an eye patch and headache

28  medication were unacceptable forms of treatment that unjustifiably delayed necessary

surgery, Defendants would not be entitled to qualified immunity.  If, however, Michaud is unable to demonstrate a conscious disregard of his serious need, or if the evidence ultimately demonstrates that an eye patch is an arguably appropriate treatment, Defendants may be entitled to qualified immunity.  This is not a situation where the dispute concerns "what objectively reasonable inference may be drawn" from the facts, but rather what the facts underlying the incident actually are.  *Conner*, 672 F.3d at 1132 n.2.[5]  Due to this conflict, the Court denies Defendants' request to escape liability through qualified immunity.  *See Hampsmire v. City of Santa Cruz*, ___ F. Supp. 2d ___, 2012 WL 4497990, at *9 (N.D. Cal. 2012) (refusing to apply qualified immunity where no facts appeared in the record to allow determination of plaintiff's constitutional claims).

As ample cases within this District and elsewhere demonstrate, Defendants are under an obligation to provide constitutionally adequate medical treatment for an inmate; here, a question of fact exists as to whether they did so.  As a result, qualified immunity is unavailable to them at this stage.

## V.   CONCLUSION

In sum, Michaud has done enough to raise a triable issue of fact as to his serious medical need, deliberate indifference to that need, and to the existence of injuries that flowed from Defendants' delays.  Because these factual disputes are material to Defendants' qualified immunity defense, the question of whether Defendants may avail themselves of this defense should be reserved for the jury.

///

_____

[5]This rule does not conflict with the Supreme Court's statement that qualified immunity applies equally to situations involving either a mistake of law, a mistake of fact, or a mixed mistake of law and fact. *See Pearson*, 555 U.S. at 231. By way of explanation, qualified immunity might be appropriate for a police officer who arrested an individual because the officer mistook a mobile phone on a waistband for a gun. However, qualified immunity cannot be decided on summary judgment if there is a dispute between the parties as to whether the police officer saw the phone or not.  If the police officer did see the phone prior to the arrest, qualified immunity may be proper; if the officer did not see the phone, qualified immunity does not protect his unlawful arrest. This factual dispute must then be submitted to the jury.

1

2

As this case cannot be decided as a matter of law, IT IS ORDERED that Defendants' Motion for Summary Judgment (dkt. no. 69) is DENIED.

3

4

5

IT IS FURTHER ORDERED that Defendants' Motion for Extension of the Dispositive Motion Deadline (dkt. no. 61) is GRANTED, and Plaintiff's Motion to Strike (dkt. no. 71) is DENIED.

6

7

DATED THIS 26th day of December 2012.

8

9

10

MIRANDA M. DU
UNITED STATES DISTRICT JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28